**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Brittany M. Dudas,** | ) | **CASE NO. 1:19 CV 2565** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **Vs.** | ) | |
| | ) | |
| **Gregory Engel,** *et al*, | ) | **Memorandum of Opinion and Order** |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

### INTRODUCTION

This matter is before the Court upon (1) defendant Gregory Engel's Motion for Summary

Judgment (Doc. 28); (2) defendant the City of Bay Village's Motion for Summary Judgment

(Doc. 29); and (3) defendants' joint Motion to Strike Plaintiff's Expert Report (Doc. 30).  This is

a §1983 action arising out of plaintiff's interactions with the City of Bay Village's Police

Department.  For the reasons that follow, defendants' joint Motion to Strike is GRANTED.  In

addition, Gregory Engel's Motion for Summary Judgment is DENIED in part and GRANTED in

part and the City of Bay Village's Motion for Summary Judgment is GRANTED.

### FACTS

1

Plaintiff Brittany M. Dudas brought this action against the City of Bay Village Police Department and Officer Gregory Engel ("Engel").  The Complaint contains four claims for relief.  Count One alleges a violation of 42 U.S.C. § 1983 for illegal seizure and false arrest.  Count Two is a municipal liability claim for failure to train and supervise.  Count Three alleges a violation of 42 U.S.C. § 1983 for use of excessive force.  Count Four is a state law claim for civil liability for criminal conduct.  Counts One, Three, and Four are asserted against Engel in his individual capacity and Count Two is asserted against the City of Bay Village Police Department.[1]

Written documentary evidence submitted to the Court establishes the following.

On the evening of November 2, 2017, plaintiff was at a friend's home with Daniel Capp ("Capp"), Robert Lebron ("Lebron"), and Lauren Hill ("Hill") in the City of Bay Village ("Bay Village").  According to plaintiff's deposition testimony, she had consumed "maybe a beer" that evening.  She was 19 years old at the time.  According to Hill's deposition testimony, plaintiff was "slightly intoxicated."  Just before 2:00 a.m. on November 3, 2017, plaintiff and Hill left their friend's home and walked to plaintiff's residence (the "Dudas residence").

Around that same time, defendant Engel was on routine patrol in Bay Village.  In the days and weeks prior, there had been a series of vehicle break-ins in the area that he was patrolling.  On November 2, 2017, there had been four cars broken into in the early morning hours.  There had not been any calls for vehicle break-ins that evening.

---

[1]     It is well-established that police departments "are not *sui juris* and, therefore, cannot sue or be sued.  They are merely sub-units of the municipalities they serve."  *Deir v. Lake County*, 2012 WL 1142467, *3 (N.D. Ohio April 4, 2012) (internal citations omitted).  Accordingly, the Court will construe the Complaint as asserting a claim against the City of Bay Village.

2

Just prior to 2:00 a.m. on November 3, 2017, Engel was sitting at a red light at the intersection of Columbia and Wolf Roads, just south of the Dudas residence.  While sitting in the intersection, Engel saw Lebron driving a Honda Element on Wolf Road.   Lebron turned onto Columbia Road.  Engel knew that Lebron had a history of low-level offenses and did not normally drive a Honda Element.

Engel continued to patrol the area and returned to the Columbia and Wolf intersection five minutes later.  At that time, Engel saw a group of four people walking down Columbia Road, towards the beach.  Based upon his experience, Engel knew that the beach at the end of Columbia Road was a place where individuals frequently drank alcohol or smoked marijuana after it closed at dusk.  Engel then turned off of Columbia Road and onto Juneway Drive in order to circle the block.  According to Engel's deposition testimony, he intended to speak with the group he had just passed.  The group had dispersed by the time Engel had circled the block.  Engel did not see anyone run from him.  He suspected that one of the members of this group was Lebron, because he had just seen him driving in the area.  Engel then noticed that the Honda Element he had just seen Lebron driving was parked on Juneway Drive.  Engel ran the registration of the Element, which confirmed that the vehicle belonged to Lebron.  According to Lebron's deposition testimony, his vehicle had broken down that night, so he parked it on Juneway and walked home.

Engel got out of his police vehicle and saw a white male with brown hair, a red shirt, and blue jeans standing in the side yard of 511 Juneway Drive.  This male was later determined to be Capp.  When Capp saw Engel, he began to run.  Engel yelled "Stop, police," but Capp continued to run away from him.  Around the same time, the residents of 511 Juneway Drive called the

3

police to report that they had seen a man in a red shirt standing up against a window of their home, possibly taking photos of them.

Because Capp took off running from him, Engel believed that Capp was possibly involved in the recent vehicle break-ins.  Engel called for backup and the other officers on duty responded and formed a perimeter around the area.  These officers were Sergeant Silva ("Silva"), Officer Michael Bourque ("Bourque"), Officer Chase, and Officer Yodice.  At that point, it was raining heavily.

The officers began to search for Capp by foot through the backyards in the area.  Silva heard a snapping sound at the rear of 458 Columbia Road, which is the Dudas residence. Bourque also heard "commotion" and a snapping sound.  Engel heard movement in the backyards nearby and discovered an iPhone lying on the sidewalk in front of 510 Columbia Road.  He picked it up and saw three notifications on the screen, one of which was a Snapchat notification from a "Brittany."  The background photo on the phone's screen was a picture of several people Engel knew to be friends with plaintiff.  Due to the proximity of the phone to the Dudas residence, Engel inferred that the "Brittany" Snapchat notification was from plaintiff Brittany Dudas and the owner of the phone was someone affiliated with her.  This phone was later determined to be Capp's.

Engel thereafter headed towards the Dudas residence.  Silva pointed out a broken fence post in the backyard, which Silva deduced was the source of the snapping sound he heard.  The officers noticed that the patio door leading to the back of the Dudas residence was open and there were footprints leading into it.  Based upon this information, Engel believed that Capp had gone into the Dudas residence.

4

Engel and Bourque then approached the front door of the Dudas residence.  Engel knocked on the door.  Plaintiff opened the front door and stepped out onto the front porch.  She immediately began to yell, scream, and swear at Engel and Bourque.  There are several different versions of what transpired next.

According to Engel, it was "immediately apparent" that plaintiff had been drinking.  He could "smell alcohol" on her and knew that she was underage.  However, he concedes that he did not note anything about underage consumption in his police report.  Engel testified that he "attempted to speak with her and explain" his presence.  However, he was not able to get "a word in edgewise."   While Engel testified that he was not able to speak with plaintiff normally "due to all of her yelling," he agreed that it was "probably accurate" that plaintiff told him to get off of her property.  During this exchange, Engel grew concerned that plaintiff was delaying his investigation into the suspect he was chasing.  He did not feel that his safety was at risk.  In the midst of Engel explaining to plaintiff why they were at her door, she attempted to run back into the house.  Engel then grabbed plaintiff's arm to prevent her from reentering the residence.  Plaintiff struggled with Engel and continued to yell.  Engel advised plaintiff that she was being detained and placed her "in an arm lock escort position."  Plaintiff continued to resist, so he moved her down the front steps and onto the front lawn.  Engel then placed her on the ground.  However, while he was placing her on the ground, he slipped on the wet grass and fell down with her.  Engel then handcuffed plaintiff and escorted her into a nearby police vehicle.

According to Bourque's deposition testimony, plaintiff was screaming at Engel from the "get-go."  Plaintiff told them to get off of her property.  Engel "tried to explain to her why [they] were there."  Plaintiff then turned to go back into her home.  Engel told her she was going to be

5

detained and "grabbed ahold of her arm and escorted her down the stairs." Plaintiff then started to fight with Engel and pull away from him. Engel then escorted her to the ground and handcuffed her. Bourque smelled alcohol on plaintiff when she was sitting in the back seat of the police vehicle.

According to plaintiff's deposition testimony, she immediately began to swear at Engel and told him to leave her property. The only thing Engel asked her was where Lebron and Capp were. Plaintiff responded she did not know. When she turned around to go back inside, Engel grabbed her right arm and threw her off the front porch. Plaintiff did not fight back. During this takedown to the ground, Engel called her a bitch, put his knee into her back, threw her in the mud, and dragged her through the front yard. She injured her knee and Achilles during this process. Engel then handcuffed her and put her in the back of the police vehicle.

According to Hill's deposition testimony, plaintiff was yelling and agitated before she went out the front door. Hill heard Engel ask plaintiff where Lebron and Capp were. Plaintiff then told Engel they were not there and would not let him search the house. Plaintiff then turned around to come back inside and Engel grabbed both of plaintiff's arms. He then threw plaintiff to the ground face first and put handcuffs on her.

Krystal Dudas, plaintiff's sister, was asleep in the Dudas residence that night. According to her deposition testimony, she woke up to flashlights shining through her bedroom window and plaintiff yelling. She got up, went into the living room, and looked out the window. She saw Engel grab plaintiff's arm and drag her down the steps. Engel then threw plaintiff to the ground face first. She also heard the word "bitch" being spoken loudly. Plaintiff did not seem intoxicated to her.

6

Hannah Arbaugh was also sleeping at the Dudas residence that night.  According to her deposition testimony, she also woke up to the sounds of plaintiff yelling.  She got up and looked out the window.  She observed Engel grab plaintiff and "basically [throw] her down the steps." She further explained that plaintiff then fell down to the ground with Engel.  Plaintiff did not resist or fight with Engel during this.  Plaintiff also did not appear to be intoxicated.

Once plaintiff was handcuffed and in the back of the police vehicle, Engel returned to the front door of the Dudas residence.  He spoke with Lisa Dudas, plaintiff's mother and the homeowner, who had been woken up by the altercation.  Lisa Dudas testified that the officers explained to her that plaintiff had not done anything wrong, but was being detained because they were looking for someone.

Lisa Dudas then consented to a search of the residence, which lasted about 10 minutes. This 10 minute search did not yield the discovery of any individuals.  Plaintiff remained in the backseat of the police vehicle for approximately 15 minutes.  She was immediately taken out of the police vehicle once the search had concluded.  She was not charged with any crimes.  Capp later testified that he was in the grass in a nearby backyard.

This matter is now before the Court upon defendants' Motions for Summary Judgment. Plaintiff opposes both Motions.  In addition, defendants jointly filed a Motion to Strike Plaintiff's Expert Report.  Plaintiff opposes this Motion.

**STANDARD OF REVIEW**

Summary Judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376,

378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material

facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial
> responsibility of informing the district court of the basis for its
> motion, and identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with affidavits," if any, which it believes demonstrates the
> absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).  A fact is "material only if its resolution

will affect the outcome of the lawsuit."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate

that "there is [more than] some metaphysical doubt as to the material facts."  *Moore v. Philip*

*Morris Cos., Inc*., 8 F.3d 335, 340 (6th Cir.1993).  The nonmoving party may not simply rely on

its pleading, but must "produce evidence that results in a conflict of material fact to be solved by

a jury."  *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

The evidence, all facts, and any inferences that may permissibly be drawn from the facts

must be viewed in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co.*

*v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs.,*

*Inc.*, 504 U.S. 451, 456 (1992).  However, "[t]he mere existence of a scintilla of evidence in

support of the plaintiff's position will be insufficient; there must be evidence on which the jury

could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252.

Summary judgment should be granted if a party who bears the burden of proof at trial

does not establish an essential element of his case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d

937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Moreover, if the evidence is "merely

colorable" and not "significantly probative," the court may decide the legal issue and grant

summary judgment. *Anderson*, 477 U.S. at 249-50 (citation omitted).

**ANALYSIS**

**I.**    **MOTION TO STRIKE**

Plaintiff has introduced an expert report from Robert T. Johnson ("Johnson") in support of her opposition to defendants' Motions for Summary Judgment. Defendants contend that Johnson's report amounts "to nothing but impermissible legal conclusions," which are inadmissible under the Federal Rules of Evidence.[2]

The admissibility of expert testimony is governed by Fed. R. Evid. 702, which provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Opinion testimony is "not objectionable just because it embraces an ultimate issue" to be

---

[2]    The Court notes that defendants have filed a "Motion to Strike" Johnson's report. A "motion to strike" applies only to pleadings. Fed.R.Civ.P. 12(f). It is not the correct procedural vehicle to attack exhibits filed in support of, or in opposition to, motions for summary judgment. *Berry v. Citi Credit Bureau*, 2020 WL 6440490 at * 6 (W.D. Tenn. March 30, 2020) ("[A] motion to strike is not the proper device for countering exhibits or affidavits attached to memoranda in support of motions."), *adopted by,* 2020 WL 4596774 (W.D. Tenn. Aug. 11, 2020); *Adams v. Valega's Prof. Home Cleaning, Inc.*, 2012 WL 5386028 at * 2 (N.D. Ohio Nov. 2, 2012)(collecting cases). Accordingly, the Court construes defendants' motion to strike as an objection brought under Fed. R. Civ. P. 56.

decided by the trier of fact.  Fed. R. Evid. 704.  However, "testimony offering nothing more than a legal conclusion-i.e, testimony that does little more than tell the jury what result to reach-is properly excludable under the Rules."  *Woods v. Lecureux*, 110 F.3d 1215, 1220 (6th Cir.1997).  "It is also appropriate to exclude ultimate issue testimony on the ground that it would not be helpful to the trier of fact when the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular."  *Id.*  (internal quotations and citations omitted)

In the context of claims against the police, experts are routinely permitted to "testify about discrete police-practice issues when those experts are properly credentialed and their testimony assists the trier of fact."  *Champion v. Outlook Nashville, Inc.,* 380 F.3d 893, 908 (6th Cir. 2004).  However, when an expert's opinion amounts to defining legal terms and opining whether certain conduct violated or was consistent with those legal terms, it is inadmissable.  *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994).  This includes statements such as "it was objectively unreasonable for [an officer] to shoot [the plaintiff]," *DeMerrell v. City of Cheboygan*, 206 Fed.Appx. 418, 426 (6th Cir. 2006), whether or not an officer had probable cause to take an certain action, *Id.*, and "whether the officers used reasonable force," *Hubbard v. Gross*, 199 F. App'x 433, 443 (6th Cir. 2006).

Here, plaintiff has proffered Johnson's expert report wherein he concludes:

1.  Brittany Dudas was under no obligation to speak with the Bay Village Police Officers who came to her house in the early morning hours of November 3, 2017 and she was free to re-enter the house as there was no reasonable suspicion to detain her; and

2.  The force used by Officer Gregory Engel in detaining Brittany Dudas was contrary to accepted law enforcement practices, standards, and training.

10

Defendants argue that Johnson's report should be "ignored and disregarded for summary judgment briefing" because it is entirely made up of legal conclusions.  Defendants assert that many of the statements supporting these two overarching opinions contain either legal conclusions, defined legal terms of art, or factual determinations properly left to the jury and, therefore,  should be excluded.

In response, plaintiff concedes that several of Johnson's statements are impermissible legal conclusions.[3]  However, she maintains that overall,  Johnson's opinion "permissibly assists the jury" in understanding that Engel's actions fell "below the standard of care of national[ly] accepted law enforcement practices, standards, and training."

Upon review, the Court agrees with defendants that Johnson's report largely consists of inadmissible legal conclusions.  With respect to Johnson's first opinion, i.e. whether Engel had reasonable suspicion to detain plaintiff, this is plainly a legal conclusion that an expert is not permitted to make.  Indeed, it is the Court's role to define legal terms such as reasonable suspicion and the role of the factfinder to determine if the facts satisfy the definition.  *See Berry*, 25 F.3d at 1353 ("It is the responsibility of the court, not testifying witnesses, to define legal terms.")

The second opinion, i.e. the force was contrary to accepted law enforcement practices, is also inadmissible in its present form.  The Court acknowledges that an expert is permitted to offer testimony regarding continuum of force policies and procedures.  *Champion*, 380 F.3d at 908 (allowing expert testimony in excessive force case regarding "the continuum of force

---

[3]     Plaintiff argues that these statements may be "recharacterized" to make them admissible at trial.  However, the Court cannot assess these "recharacterized" statements because they are not actually within Johnson's report.

11

employed by officers generally, the specific training the Officers received, and [the expert's] opinion that if the witnesses' testimony is credited, the Officers' actions violated nationally recognized police standards governing excessive force.")  However, a careful review of Johnson's report reveals that he does not actually explain what the recognized police standards and practices governing excessive force are, or even what specific excessive force guidelines Engel was subject to.  Rather, the basis of Johnson's opinion is his application of the facts to the factors enunciated in *Graham v. Conner*, 490 U.S. 386 (1989) to determine whether or not the force used was objectively reasonable.  Johnson is not permitted to reach such a legal conclusion.  *See Norman v. City of Lorain, Ohio*, 2006 WL 5249725, *3 (N.D. Ohio 2006) (holding that an expert may testify regarding proper police procedures to be followed in the situation the officer found himself in, but could not testify that the force used was unreasonable or unnecessary).

Indeed, "[b]ecause testimony about whether the officers used reasonable force is a legal conclusion and may confuse the trier of fact, the district court is within its sound discretion to exclude it.  *Hubbard v. Gross*, 199 Fed.App'x 433, 443 (6th Cir. 2006).  Accordingly, the following statements are also inadmissible:

- There was no crime committed by Dudas nor was there reason to suspect she was involved in a crime.

- At the point in time Brittany tried to enter the house she did not pose a threat to the officer or others.  She had not threatened or touched an officer and she had no lawful obligation to remain and answer questions from the officers.

- Brittany had not been advised she was under arrest and she had no lawful obligation to remain and answer questions from the officers and she was merely trying to re-enter her residence.

12

- As there was no reasonable suspicion to detain Brittany Dudas, Officer Engel using force in grabbing her arm, placing it in an armlock and performing a takedown was unnecessary, unreasonable[,] and constituted an assault and excessive force.

In addition to these two main opinions, the report also contains several inadmissible statements of the law.  It is the province of the Court, not an expert, to instruct the factfinder on the legal standards applicable to the case.  *Burkhart v. Washington Metropolitan Area Transit Authority*, 112 F.3d 1207, 1213 (D.C. Cir. 1997) ("Each courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards.")  These statements include:

- Profanity directed at police officers is not a crime and not grounds for either an investigative detention or arrest.

- Running from the police by itself does not constitute a crime or justify the use of force to conduct an investigative detention.

- The standard for detaining a person for investigative detention is that an officer(s) has reasonable suspicion, supported by articulable facts/information that criminal activity has occurred or may be about to occur and the person detained is suspected to be involved.

Finally, the report contains several statements which are clearly Johnson's own weighing of the evidence and his credibility evaluation of Engel, neither of which are appropriate subject matters for expert testimony.  *See Kitchen v. Chippewa Valley Schools*, 825 F.2d 1004, 1015 (6th Cir. 1987) ("It is the jury's duty to weigh the evidence and decide the issue before it."); *United States v. Sheffer*, 523 U.S. 303, 313 (1998) (holding that the weight and credibility of witness testimony is the province of the jury).  Because these statements ultimately instruct the factfinder to conclude that Engel did not have reasonable suspicion to detain plaintiff, they are inadmissible:

13

- Officer Engel failed to provide articulable facts or circumstances that would lead a reasonable officer to reasonably suspect that the four individuals [he saw] were connected to the vehicle break-in that occurred a few blocks away and several hours to a day earlier.

- Neither Officer Engel's report nor his deposition testimony contain articulable facts known to him at the time of the detention of Brittany Dudas that would have lead a reasonable officer to reasonably suspect that Dudas had just committed a crime or was involved in the thefts from auto that occurred a day earlier.

- Based on the information documented in the police reports and deposition testimony there was not exigent circumstances to enter the house or probable cause to obtain a search warrant to search the house.

- Frankly speaking, Officer Engel's attempts to establish reasonable suspicion seem to fit the proverbial saying about, "throwing some s–t against the wall and see if it sticks."

- There is no logic in these two points that would lead a reasonable police officer to link the fence noise/noise in the backyard and the recovered cell phone with the alleged vehicle break-ins that occurred a few blocks away and several hours to a day later.

- The most glaring example of Officer Engel's faulty reasoning was when it was called to his attention that the break-in to cars, he was allegedly investigating, occurred more than 24 hours earlier, leaving plenty of time to get rid of any evidence.

- Suggesting that there was reasonable suspicion that Brittany Dudas was involved or had knowledge of the vehicle break-ins or the phantom crimes that did not occur, was a giant leap in logic.

- Given the lack of reasonable suspicion and to prevent the use of force by Officer Engel, Sergeant Silva had a duty to intervene.

In sum, much of what is contained in Johnson's report is inadmissable.  Accordingly, the

Court will not consider Johnson's report on summary judgment.  Defendants' Motion is

14

GRANTED.[4]

## II.     MOTIONS FOR SUMMARY JUDGMENT

### A.     Federal Claims

### 1.     Officer Engel (Counts One and Three)

Counts One and Three assert claims under 42 U.S.C. § 1983 against Engel.  Count One asserts a claim of illegal seizure and false arrest and Count Three asserts a claim of excessive force.

To prevail on a § 1983 claim, plaintiff must prove 1) the deprivation of a right secured by the Constitution or laws of the United States which was 2) caused by a person acting under the color of state law.  *Winkler v. Madison County*, 893 F.3d 877 (6th Cir. 2018) (citations omitted). Where, as here, the individual defendant asserts qualified immunity, the government officials may not be held liable if 1) the officers did not violate any constitutional guarantees or 2) the guarantee, even if violated, was not clearly established at the time of the alleged misconduct. *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 992 (6th Cir. 2017) (citations omitted). *See also Maye v. Klee*, 915 F.3d 1076, 1082 (6th Cir. 2019) ("In analyzing whether an official is entitled to qualified immunity, we must make two determinations: first, whether the plaintiff's version of the facts alleges the deprivation of a constitutional right; and second, whether that right was clearly established such that a reasonable official would have known his actions were unconstitutional.")

---

[4]     As this stage in the proceedings, the Court is only considering defendants' Motion in the context of summary judgment.  If this matter is to proceed to trial, defendants may then file a motion *in limine* to challenge Johnson's ability to testify at trial.

### (a.)  Illegal Seizure and False Arrest (Count One)

In Count One of the Complaint, plaintiff asserts a § 1983 claim for "federal illegal seizure and false arrest" against Engel.   Plaintiff argues that Engel impermissibly detained her in violation of the Fourth Amendment.  She maintains that Engel had no "articulable facts that criminal activity may be afoot" to justify her seizure.  According to Engel, he had "cause to arrest or detain" plaintiff for obstruction of official business.

In order for a seizure to be considered reasonable under the Fourth Amendment, it must be supported by an accepted justification.  *United States v. Goyer*, 567 Fed.Appx. 414, 418 (6th Cir. 2014).  "[W]here there has been a limited intrusion on a person's liberty but no formal arrest, that intrusion may be justified by something less than probable cause."  *Harris v. Langley*, 647 Fed.Appx 585, 591 (6th Cir. 2016).  A brief detention may occur when an officer has a "'reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity.'"  *United States v. Jones*, 673 F.3d 497, 502 (6th Cir. 2012) (quoting *United States v. Place*, 462 U.S. 696, 702 (1983)).  "The officer 'must be able to articulate something more than an inchoate and unparticularized suspicion or hunch.'"  *Id.* (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).  Indeed, there must be a "reasonable suspicion" of criminal activity based on "specific and articulable facts[.]"  *Terry v. Ohio*, 392 U.S. 1, 21, 27 (1968).  However, "[w]hile an officer making a *Terry* stop must have more than a hunch, 'reasonable suspicion' is considerably less than proof of wrongdoing by a preponderance of the evidence."  *United States v. Hurst*, 228 F.3d 751, 757 (6th Cir. 2000) (citing *Sokolow*, 490 U.S. at 7).

On the other hand, a brief detention may result in a *de facto* arrest for which probable cause is required.  *Hoover v. Walsh*, 682 F.3d 481, 498 (6th Cir. 2012) ("An investigative

16

detention that is constitutionally permissible when initiated may ripen into a seizure that must be based on probable cause.")(internal quotations and citations omitted) In determining whether an arrest occurred, a court must consider the reasonableness of the detention under the totality of the circumstances. *Id.* This includes considering such factors as "the transportation of the detainee to another location, significant restraints on the detainee's freedom of movement involving physical confinement or other coercion preventing the detainee from leaving police custody, and the use of weapons and bodily force." *Id.* (internal quotations omitted). The Sixth Circuit has found that the use of "guns, handcuffs, and detention in a police cruiser do not automatically transform a *Terry* stop into an arrest." *Brown v. Lewis*, 779 F.3d 401, 415 (6th Cir. 2015) (internal quotations omitted). However, intrusive measures such as these "are warranted to secure a detainee only where specific facts lead to an inference that the detainee poses a risk of flight or of violence to the officers." *Id. See also Bennett v. City of Eastpointe*, 410 F.3d 810, 836-837 (6th Cir. 2005) ("[F]or the use of handcuffs during a *Terry* stop, the Fourth Amendment requires some reasonable belief that the suspect is armed and dangerous or that the restraints are necessary for some other legitimate purpose.")

Although plaintiff appears to apply the "reasonable suspicion" test, Engel also argues that "probable cause" supports the detention. In order to determine which "accepted justification" is required, the Court must first determine whether plaintiff's detention resulted in an investigative stop, which need only be supported by reasonable suspicion, or a *de facto* arrest for which probable cause is required.

Upon review, the Court finds that plaintiff's detention resulted in an arrest. Here, according to plaintiff, when she attempted to return inside her house, Engel grabbed her,

17

handcuffed her, and placed her in the back of a police vehicle.  Engel argues that the acts of

handcuffing plaintiff and putting her in a police vehicle are permitted under *Terry*, and do not

transform an investigative detention into an arrest.  Engel fails, however, to present evidence or

argument that plaintiff was armed and dangerous or that restraints were necessary for a

legitimate purpose.  In fact, Engel expressly testified that he did not believe his safety was at risk

at any point during his interaction with plaintiff.   The Court acknowledges that Engel was

chasing a male suspect whom he believed may had been involved in a series of vehicle break-ins.

However, he does not point to any evidence that it was plaintiff whom he was chasing or that she

was somehow involved in the vehicle break-ins.   Because there is no evidence that there was

ever a concern for officer safety or that plaintiff was somehow a flight risk, the Court finds that

plaintiff's detention matured into an arrest requiring probable cause. *United States v.*

*Richardson*, 949 F.2d 851, 856 (6th Cir. 1991) ("When actions by police exceed the bounds

permitted by reasonable suspicion, the seizure becomes an arrest and must be supported by

probable cause.")

 Because plaintiff's detention constituted an arrest, the Court must now determine whether

or not Engel had probable cause to arrest her.   Probable cause exists when "the facts and

circumstances within [the officer's] knowledge and of which [he or she] had reasonably

trustworthy information were sufficient to warrant a prudent [person] in believing that the

petitioner had committed or was committing an offense." *Beck v. State of Ohio*, 379 U.S. 89, 91

(1964).   "To determine whether officers had probable cause to arrest an individual, we must

look to the law of the jurisdiction at the time of the occurrence." *Patrizi v. Huff*, 690 F.3d 459,

464 (6th Cir. 2012)(quoting *Ingram v. City of Columbus*, 185 F.3d 579, 592-593 (6th Cir. 1999)).

Engel argues that he had probable cause to arrest plaintiff for obstruction of official business.  Ohio's obstruction of official business statute provides:

> [N]o person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties.

O.R.C. § 2921.31(A).  Accordingly, to arrest a suspect under this provision, an officer must have probable cause to believe that the suspect (1) performed an unprivileged act; (2) with the purpose of preventing, obstructing, or delaying the performance of a public official's duties; (3) which hampers or impedes the public official in performing those duties.  *Lyons v. City of Xenia*, 417 F.3d 565, 573 (6th Cir. 2005).  "Ohio courts have emphasized the importance of the first element, the requirement that the defendant commit an affirmative act."  *Smith v. City of Wyoming*, 821 F.3d 697, 715 (6th Cir. 2016).

With respect to the first element, the Court finds Engel did not have probable cause to believe that plaintiff had engaged in an unprivileged, affirmative act.  It is undisputed that when Engel knocked on the door, plaintiff immediately launched into a profanity-laced tirade at the officers.  However, she also told the officers to get off of her property.  Plaintiff then turned around to go back into her residence.  Plaintiff was under no obligation to allow Engel into her home.  Her choice to go back into her residence and end the interaction was not an "unprivileged act."  Rather, it was a valid exercise of her constitutional rights.  *Kentucky v. King*, 131 S.Ct. 1849, 1862 (2011) ("When law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do . . . And even if an occupant chooses to open the door and speak with the officers, the occupant need not allow the officers to enter the

19

premises and may refuse to answer any questions at any time.")[5]   The Sixth Circuit has

recognized that under Ohio law "the assertion of the constitutional rights to refuse and resist

entry [cannot] give rise to an obstruction of justice violation." *Ingram,* 185 F.3d at 595.

Engel argues that plaintiff's "loud, profane tirade" constituted an obstruction of his

investigation.  The Court disagrees.  Probable cause could not have been based on plaintiff's

words alone.  Indeed, Ohio courts generally "have not treated speech alone as an act for purposes

of the statute." *Smith,* 821 F.3d at 716.  Unless the language constitutes "fighting words," a

"citizen's verbal assault on a police officer does not, standing alone, constitute criminal

conduct." *State v. Stayton*, 709 N.E.2d 1224, 1227 (Ohio App. 1st Dist. 1998).[6]  This includes

language which is "rude, abusive, offensive, derisive, vulgar, insulting, crude, profane or

opprobrious." *Osberry v. Slusher,* 750 Fed.Appx. 385, 393 (6th Cir. 2018) (quoting *D.D. v.

Scheeler*, 645 Fed.Appx 418, 425 (6th Cir. 2016)).

The Court acknowledges that under limited circumstances, "hostile or abusive speech"

can support a charge of obstructing official business.  *Lyons*, 417 F.3d at 574-575.  However, a

review of Ohio case law indicates that this only occurs in situations where an individual was

persistently disrupting the police from their investigation and continued to do so after multiple

warnings.  *See North Ridgeville v. Reichbaum*, 112 Ohio App.3d 79, 84–85 (Ohio App. 9th Dist.

---

[5]     Engel suggests that he could have entered the Dudas residence without a warrant
or consent due to the "hot pursuit" exception.  Not only is this argument
underdeveloped, the Court notes that plaintiff is not challenging Engel's
warrantless search of her residence.

[6]     Engel makes no argument that plaintiff's speech constituted "fighting words," i.e.,
"words which an onlooker would consider a direct personal insult or an invitation
to exchange fisticuffs."  *Sandul v. Larion*, 119 F.3d 1250, 1255 (6th Cir. 1997)
(internal quotations omitted).

20

1996) (arrestee repeatedly refused to follow directions and continued to shout to prevent a police-witness interview); *State v. Fort*, 2003 WL 930487, at \*3–4 (Ohio App. 7th Dist. 2003) (arrestee repeatedly questioned officers during their investigation, which forced officers to stop their investigation); *State v. Herron*, 2011 WL 281130, \*2 (Ohio App. 2nd Dist. 2011) (arrestee continued to scream and swear at officers after being warned five times that if she continued to do so she would be arrested for obstruction).  *See also Lyons*, 417 F.3d at 574-575 (arrestee conduct of "profanity-laced yelling and finger pointing" after police officer's repeated requests to cooperate constituted obstruction); *Marsili v. Vill. of Dillonvale*, 2014 WL 1922236, at \*16 (N.D.Ohio 2014) (finding probable cause for arrest where Section 1983 plaintiff repeatedly interrupted officers' questioning of a witness).   Here, however, there is no evidence that Engel had provided plaintiff with multiple warnings that she was interrupting an investigation or that plaintiff interrupted him while he was speaking with another individual.  Plaintiff also was not acting physically aggressive towards Engel, such as pointing her finger or getting close to his face.  Their interaction was short: Engel wanted to get into the home and plaintiff, an adult resident of the home, permissibly declined this request.[7]

Engel heavily relies on the state appellate court case of *State v. Wellman*, 879 N.E.2d 215 (Ohio App. 1st Dist. 2007) to support his argument.  In *Wellman*, the police personally observed several liquor-permit violations in a nightclub.  *Id.* at 217.  The police then attempted to locate the individual in charge of the nightclub in order to issue a citation.  *Id.*  An employee directed them to the manager of the nightclub.  *Id.*  During the police officers' questioning of the

---

[7]    Engel inaccurately suggests that only the homeowner could consent to or deny a search of the home.

21

nightclub manager, the defendant interrupted their questioning three times in a belligerent manner.  *Id.*  During this third interaction, the defendant identified himself as the owner of the nightclub.  *Id.*  In truth, the defendant was a minority shareholder of the club and not involved in its daily operations.  *Id.*  The police then asked to see his identification and the club's liquor permit, explaining to the defendant that Ohio law required him to show these items.  *Id.* at 218. The defendant then refused to do so and walked away. The police officers ordered the defendant to stop twice and finally placed him under arrest for obstruction.  *Id.*

Engel asserts that *Wellman* is an "analogous case" to the circumstances presented here. The Court disagrees.  In *Wellman*, the defendant repeatedly interrupted an ongoing conversation the police were having with another individual.  Moreover, the defendant in *Wellman*, once he identified himself as an "owner" of the nightclub, further hindered the police's ability to issue a liquor license citation to the proper party.  As noted above, Ohio courts have found probable cause for obstruction where there are repeated interruptions or disruptions of an officer's investigation.  Here, there is no evidence that plaintiff repeatedly attempted to interrupt Engel's investigation or disrupt a conversation that he was having with a suspect or other individual.

 Engel also argues that plaintiff obstructed his ability to "request a voluntary search of the premises."  However, plaintiff had already denied this request, albeit in a rude manner. "Declining to obey an officer's request does not fall within the scope of Ohio's obstruction of official business statute."  *Rarick v. United States*, 814 Fed.Appx. 62, 66 (6th Cir. 2020).

Accordingly, the Court finds Engel did not have probable cause to arrest plaintiff for obstructing official business.

Because Engel has asserted qualified immunity, the Court must next examine whether it

22

was clearly established that Engel lacked probable cause to arrest plaintiff for obstructing official business.  An officer is entitled to qualified immunity unless existing precedent "placed the statutory or constitutional question confronted by the official beyond debate." *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2023 (2014) (internal quotations omitted).  The "crucial question" is "whether the official acted reasonably in the particular circumstances that he or she faced." *Id.*

In determining "whether an officer could reasonably conclude that probable cause exists under a given set of circumstances," the court imputes "knowledge of state-law definitions and state-court interpretations of a statute to police officers." *Pritchard v. Hamilton Twp. Bd. of Trs.*, 424 F. App'x 492, 506 (6th Cir.2011).

Specific to O.R.C. § 2921.31, "case law consistently requires an affirmative act, the purpose of obstructing a public official, and the result of actually obstructing an official." *Smith*, 821 F.3d at 717.  It is also "well established that the affirmative act requirement is only satisfied by particularly obstructive acts, or what can fairly be characterized as 'aggressive, boisterous, or unduly disruptive conduct.'" *Id.* (citing *Patrizi*, 690 F.3d at 466).

Although the Court determined that probable cause is lacking because plaintiff did not engage in an "affirmative act," the case law in existence at the time was not clearly established. As an initial matter, plaintiff cites only to *Terry* in support of her claim.  But *Terry* is wholly irrelevant as to whether Engel had probable cause to arrest plaintiff for violating  O.R.C. § 2921.31.  The Supreme Court has repeatedly indicated that "clearly established law . . . should not be defined at a 'high level of generality,' [but rather] must be 'particularized' to the facts of the case." *White v. Pauly*, 137 S.Ct. 548, 552 (2017).   A review of Ohio case law at the time of the occurrence reveals that the interpretation of the affirmative act requirement with respect to

23

verbal conduct is varied.  For example, some courts found that an individual may be convicted if their "purposeful loud, boisterous, and uncooperative conduct" makes it "more difficult" for law enforcement to gain control of a situation.  *State v. Florence*, 2014 WL 2526069, at *3 (Ohio Ct. App. 12th Dist. 2014).  Similarly, other courts have found that if "loud and boisterous speech" makes it impossible to investigate a complaint, this can constitute an affirmative act.  *City of Warren v. Lucas*, 2000 WL 655446, *2-3 (Ohio Ct. App. 11th Dist 2000).   The Sixth Circuit, in interpreting Ohio law, has found that a reasonable officer could find an affirmative act where an individual engages in "profanity-laced yelling and finger pointing," "disruptive" speech, and refuses to provide information.  *Lyons*, 417 F.3d at 574-575.  On the other hand, other courts have found that an individual's "loud and boisterous speech" to a police officer was not an "act" under the statute.  *State v. Smith*, 671 N.E.2d 594, 596-598 (Ohio Ct. App. 4th Dist 1996).  *See also Stayton*, 126 Ohio App.3d at 164 ("a citizen's verbal assault on a police officer does not, standing alone, constitute criminal conduct.")

At the time Engel approached plaintiff's front door, officers were in pursuit of a suspect believed to have been involved in recent auto thefts.  A nearby homeowner also reported that the individual was trespassing and possibly taking photographs.  Officers observed an open back door with footprints leading into the Dudas residence.  Upon knocking on the door, plaintiff answered and immediately began to yell and swear at the officers, including Engel.  Plaintiff acknowledges that she had been drinking and that she was underage.  Officers were unable to explain the situation to plaintiff.  Plaintiff does not dispute that the officers sought to speak with other residents of the home and, in fact, after plaintiff's mother awoke, her mother consented to a

24

search of the home.[8]  This is not a situation in which plaintiff simply decided not to speak to the officers in calm demeanor.

Based on the case law and the facts of this case, the Court finds that a reasonable officer would not have understood that he lacked probable cause to arrest plaintiff.  Qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law."  *White*, 137 S.Ct. at 551.  Neither of those prongs applies here.

Accordingly, the Court grants Engel's Motion for Summary Judgment on Count One.

### (b.) Excessive Force (Count Three)

In Count Three of the Complaint, plaintiff asserts a § 1983 claim for the "federal excessive force."  She alleges that Engel used excessive physical force in effectuating her detainment.  According to plaintiff, Engel grabbed her, threw her to the ground, and dragged her across the front lawn of her home.  According to Engel, he did not use excessive force on plaintiff.  He maintains that plaintiff had "gone limp," which caused him to slip on to the wet ground, bringing plaintiff down with him.

The Fourth Amendment prohibits the use of excessive force during an arrest or seizure. *Meirthew v. Amore*, 417 Fed.Appx. 494, 497 (6th Cir.2011); *Rudlaff v. Gillispie,* 791 F.3d 638, 641 (6th Cir. 2015).  "A claim of excessive force under the Fourth Amendment requires that a plaintiff demonstrate that a seizure occurred, and that the force used in effecting the seizure was objectively unreasonable."  *Rodriguez v. Passinault*, 637 F.3d 675, 680 (6th Cir.2011).

In determining whether the force used was objectively unreasonable, a court must pay "careful attention to the facts and circumstances of each particular case."  *Graham v. Connor*,

---

[8]  Plaintiff's claim does not challenge the constitutionality of the search.

25

490 U.S. 386, 396 (1989).  This inquiry ultimately depends upon whether the force was reasonable under "the totality of the circumstances."  *Slusher v. Carson*, 540 F.3d 449, 455 (6th Cir.2008).  However, the Supreme Court has identified three factors a court should use to guide its analysis: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others: and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight.  *Graham,* 490 U.S. at 396.

When conducting this analysis, a court should review the officer's conduct "from the perspective of a reasonable officer on the scene and not with 20/20 hindsight.'"  *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir.2007) (citing *Graham*, 490 U.S. at 395–96).  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation."  *Graham*, 490 U.S. at 396–97.

When an officer asserts qualified immunity in an excessive force case, the officer will be entitled to such, "unless existing precedent 'squarely governs' the specific facts at issue," because "[p]recedent involving similar facts can help move a case beyond the otherwise 'hazy border between excessive and acceptable force' and thereby provide an officer notice that a specific use of force is unlawful."  *Kisela v. Hughes*, 138 S.Ct. 1148, 1153 (2018) (quoting *Mullenix v. Luna*, 136 S.Ct. 305, 308, 312 (2015) (*per curiam*)).

Viewing the evidence in a light most favorable to plaintiff, the Court finds that there is a genuine issue of material fact as to whether Engel used excessive force on plaintiff.  Plaintiff's version of the facts leaves this Court no choice but to deny Engel's motion as to this claim.  According to plaintiff's testimony, after she told Engel to leave, she turned to go back into her

26

home.  At that point, Engel grabbed her without warning, threw her onto the ground, dragged her across the lawn, called her a bitch, and handcuffed her.  Engel also placed his knee into her back to restrain her during handcuffing.  Plaintiff scraped her knee during this process.  Plaintiff also insists that she did not resist Engel.  Eyewitness testimony further supports plaintiff's version of the facts, as several witnesses testified that they saw Engel throw plaintiff to the ground and plaintiff did not resist or fight him.

Moreover, the crimes Engel suspected plaintiff of, obstruction and underage drinking, are mild in severity.  *See Baker v. Union Tp,* 587 Fed.Appx. 229, 231-234 (6th Cir. 2014) (categorizing obstruction and disorderly conduct as "not severe."); *Campbell v. City of Springboro, Ohio*, 700 F.3d 779, 787 (6th Cir. 2012) ("[U]nderage drinking, while reprehensible, is a relatively minor offense.")  Accordingly, "the severity-of-the-crime factor weighs in plaintiff's favor." *Zuress v. City of Newark*, Ohio, 815 Fed.Appx. 1, 6 (6th Cir. 2020).  Plaintiff also was not armed and Engel testified that he did not fear for his safety during their interaction. *See Griffith v. Coburn*, 473 F.3d 650, 659 (6th Cir. 2007) (holding that when suspect refuses to follow officer orders, but otherwise poses no safety threat, use of significant force is unreasonable).  Viewing the facts in the light most favorable to plaintiff, Engel's action of forcing a non-threatening suspect of minor crimes down to the ground could be considered objectively unreasonable.

Engel argues that he "did not intend to hurt plaintiff."  He maintains that the reason his take-down maneuver appeared "overly rough" was because plaintiff went limp and caused him

to slip and fall.[9]  He asserts that such behavior amounted to active resistence.  However, this Court has to accept plaintiff's version and may not weigh the different versions.  "This Court makes no credibility determinations on a motion for summary judgment and takes the evidence in light most favorable to the plaintiff."  *Atkins v. Township of Flint*, 94 Fed.Appx. 342, 347 (6th Cir.2004) (citing *Bass v. Robinson*, 167 F.3d 1041 (6th Cir.1999) (reversing the district court's grant of summary judgment to defendant police officer where the plaintiff's verison of the material events differed from the defendant's version and where the plaintiff's version, if accepted, supported a claim for excessive force).  Because plaintiff's version could support a claim for excessive force, the Court finds that a question of fact remains.[10]

Furthermore, the right to be free from excessive force "is a clearly established right for purposes of the qualified immunity analysis."  *Kostrzewa v. City of Troy*, 247 F.3d 633, 641 (6th Cir. 2001).  Moreover, Sixth Circuit case law clearly establishes "the right of people who pose no safety risk to the police to be free from gratuitous violence during arrest."  *Baker v. City of Hamilton, Ohio*, 471 F.3d 601, 608 (6th Cir. 2006).  Because there are factual disputes that go directly to whether or not Engel's use of force was objectively reasonable under the circumstances, the Court is unable to grant summary judgment on the issue of qualified

---

[9]     Engel argues that plaintiff admitted that she "went limp to make herself harder to move."  However, this is not an accurate characterization of plaintiff's testimony.  Plaintiff testified that she was "limp" in the sense that she was not fighting back or "holding onto the door for dear life."

[10]     Engel has also proffered the expert report of Kevin Davis for the proposition that his actions were "consistent with generally accepted law enforcement standards."  However, Davis bases his opinion on Engel's version of the incident and appears to question the credibility of the other eyewitness accounts.  At this stage of the proceedings, the Court must reach its decision viewing the evidence in a light most favorable to plaintiff.

immunity.  *See Tolan v. Cotton,* 572 U.S. 650, 656-657 (2014) (explaining that a court may not resolve disputes of fact under either prong of the qualified immunity analysis).

Accordingly, the Court denies summary judgment to Engel on Count Three.

## 2.     City of Bay Village (Count Two)

Plaintiffs also brings a *Monell* claim against Bay Village for its alleged failure to train and supervise Engel.  In support, plaintiff points to the fact that Silva, the supervising officer at the scene, did not intervene during plaintiff's detainment.  Additionally, plaintiff argues that Bay Village failed to appropriately discipline Engel.  According to defendant Bay Village, this is not enough to support a *Monell* claim.

To succeed on a failure to train or supervise claim, the plaintiff must prove that (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury.  *Ellis ex rel. Pendergrass v. Cleveland Mun. School Dist*., 455 F.3d 690 (6th Cir.2006) (citations omitted).  The Sixth Circuit has identified two situations justifying a conclusion of deliberate indifference in claims of failure to train or supervise: 1) failure to provide adequate training in light of foreseeable consequences that could result from a lack of instruction, and 2) failure to act in response to repeated complaints of constitutional violations by its officers.  *Id.*

Upon review, the Court finds that plaintiff has set forth no facts upon which a reasonable juror could conclude that Bay Village failed to train or supervise Engel.  Indeed, plaintiff wholly fails to identify what portion of Engel's training was inadequate.  Engel testified that he attended the police academy and received regular training through both the Bay Village Police

29

Department and outside agencies.[11]  Plaintiff has adduced no evidence to suggest that this training was deficient in any matter, including with respect to the use of force.  *See Miller v. Calhoun Cty.,* 408 F.3d 803, 816-17 (6th Cir. 2005) ("Mere allegations that an officer was improperly trained or that an injury could have been avoided with better training are insufficient to prove liability.")

Similarly, plaintiff has not presented sufficient evidence to support her failure to supervise theory.  The "'failure to supervise theory' of municipal liability is a rare one." *Mize v. Tedford*, 375 Fed.Appx. 497, 500 (6th Cir. 2010).  In supporting a failure to supervise claim, the plaintiff "must meet the rigorous standards of culpability and causation that the Supreme Court has required when a plaintiff claims that a municipality has indirectly caused a violation of federal rights in spite of its facially lawful policies." *Id.* at 500 (internal quotations omitted).  Here, plaintiff has presented no evidence of prior instances of unconstitutional conduct that would demonstrate that Bay Village was deliberately indifferent.  One instance of a supervising officer not intervening during the commission of a possible constitutional violation cannot serve as a basis for a *Monell* claim against Bay Village.  *Winkler v. Madison County*, 893 F.3d 877, 903 (6th Cir. 2018) (explaining that a plaintiff cannot establish deliberate indifference where there is no evidence of previous similar instances of constitutional violations).

Finally, plaintiff points to the fact that Engel was not investigated or disciplined following this incident.  This also is not enough to support a *Monell* claim.  *Pineda v. Hamilton County, Ohio*, 977 F.3d 483, 495 (6th Cir. 2020) ("Because municipal liability requires an

---

[11]     Defendant also proffers Kevin Davis's report for the proposition that BayVillage properly trained and supervised Engel.  The Court did not need to consider this report in resolving this claim.

unconstitutional 'policy' or 'custom,' we have held that an allegation of a *single* failure to investigate a single plaintiff's claim does not suffice.")(emphasis in original)

Accordingly, the Court grants Bay Village's Motion for Summary Judgment.

## B.    State Law Claim (Count Four)

In Count Four, plaintiff asserts a state law claim for criminal conduct civil liability against Engel.  Engel argues that he is immune from liability on this claim under Ohio Revised Code § 2744.03(A)(6).

Under Ohio Revised Code § 2744.03(A)(6), an employee of a political subdivision is personally immune from liability unless

>  (a) [t]he employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;
>
>  (b) [t]he employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; [or]
>
>  (c) [c]ivil liability is expressly imposed upon the employee by a section of the Revised Code]

"[A]llegations of negligence are insufficient to overcome the immunity granted to an employee of a political subdivision who acts within his or her official duties."  *Lambert v. Clancy*, 125 Ohio St.3d 231, 234 (2010).

Plaintiff argues that a question of fact remains as to whether Engel acted with malice or in a wanton and reckless manner.  The Court agrees.  There is sufficient evidence to demonstrate that Engel acted with malice, in bad faith, or recklessly when effectuating the plaintiff's detention for the same reasons discussed above in the federal excessive force claim.  Therefore, Engel is not entitled to statutory immunity at this stage of the proceedings.

Accordingly, the Court denies summary judgment to Engel on Count Four.

**CONCLUSION**

For the foregoing reasons, defendants' joint Motion to Strike is GRANTED.  In addition,

Engel's Motion for Summary Judgment is GRANTED in part and DENIED in part and the City

of Bay Village's Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED.

                                  /s/Patricia A. Gaughan
                                PATRICIA A. GAUGHAN
                                United States District Judge
Date:   5/17/2021                 Chief Judge